DECISION AND JUDGMENT ENTRY
{¶ 1} Janet Boring ("Mother") appeals the Athens County Court of Common Pleas, Juvenile Division, judgment granting permanent custody of her daughter, Carol Boring-Myers ("Carol"), to Athens County Children Services ("CS"). Mother argues that the trial court's judgment is against the manifest weight of the evidence. Specifically, Mother contends that the trial court erred when it made (1) factual findings that she (A) "was diagnosed as having schizotypal personality disorder marked by paranoia and psychosis" and (B) "had not cleaned the home to a degree required for in home visits by the child" and (2) a "finding that the child's need for a legally secure permanent placement cannot be achieved without a grant of permanent custody[.]" We disagree because competent, credible evidence supports each finding. Accordingly, we affirm the judgment of the trial court.
 I. {¶ 2} Carol was born on May 15, 1996 to Mother and Dan Myers ("Father"). Carol's parents never married. Father is disabled because of a traumatic motor vehicle accident. He admitted that he was unable to parent Carol and supported CS having permanent custody of his daughter. Mother was the residential parent and legal custodian.
 {¶ 3} On July 2, 2002, CS received an ex parte emergency custody order based on allegations of neglect and dependency, and thus, CS removed Carol from her Mother's care. On July 3, 2002, CS filed a complaint in juvenile court alleging that Carol was a neglected and dependent child on the basis that (1) the Mother's home was unsanitary, (2) the Mother was in danger of being evicted and (3) the Mother did not know where Carol was on three occasions when CS came and once CS found Carol unsupervised on State Street in Athens. After the adjudicatory hearing on July 30 and 31, 2002, the trial court filed an entry on August 15, 2002 adjudicating Carol a neglected and dependent child.
 {¶ 4} The court held a dispositional hearing on September 30, 2002. The court filed an entry on October 18, 2002 granting temporary custody to CS.
 {¶ 5} On July 1, 2003, CS filed a motion for permanent custody of Carol. The court held a hearing on this motion on October 15 and November 4, 2003. On November 21, 2003, the trial court filed its entry granting permanent custody of Carol to CS.
 {¶ 6} Mother appeals, asserting the following two assignments of error: "I. The trial court's findings of fact were contrary to the manifest weight of the evidence and were not supported by clear and convincing evidence. II. The trial court's finding that the child's need for a legally secure permanent placement cannot be achieved without a grant of permanent custody is not supported by clear and convincing evidence and is contrary to the manifest weight of the evidence." We will consider both assignments of error together.
 II. {¶ 7} A permanent custody determination made pursuant to R.C.2151.414 must be supported by clear and convincing evidence. Inre Baby Girl Doe, 149 Ohio App.3d 717, 2002-Ohio-4470, at ¶ 89;In re Hiatt (1993), 86 Ohio App.3d 716, 725. We will not reverse a trial court's order terminating parental rights if, upon a review of the record, we find that the record contains sufficient evidence to satisfy the clear and convincing standard.Baby Girl Doe at ¶ 89; In re Wise (1994), 96 Ohio App.3d 619,626. The "clear and convincing evidence" standard is a higher degree of proof than the "preponderance of the evidence" standard generally utilized in civil cases but is less stringent than the "beyond a reasonable doubt" standard used in criminal cases.Baby Girl Doe at ¶ 89, citing State v. Schiebel (1990),55 Ohio St.3d 71, 74.
 {¶ 8} We will not substitute our own judgment for that of a trial court applying a "clear and convincing evidence" standard where some competent and credible evidence supports the trial court's factual findings. Schiebel; C.E. Morris Co. v. FoleyConstr. Co (1978), 54 Ohio St.2d 279, syllabus. The trial court's discretion in making the final determination should be given "the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." In re Alfrey, Montgomery App. No. 01CA0083, 2003-Ohio-608, at ¶ 102, citing Miller v. Miller
(1988), 37 Ohio St.3d 71, 74.
 {¶ 9} R.C. 2151.414(B)(1)(d) provides in part that the court may grant permanent custody to an agency if it is in the child's best interest and "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999." Mother does not dispute that Carol has been in CS's temporary custody for more than twelve months of the past twenty-two months.
 {¶ 10} To determine whether it is in a child's best interest to terminate parental rights, the court shall not consider the effect that granting permanent custody to the agency will have on the parent. R.C. 2151.414(C). Among the factors that the court must consider are: (1) the child's interaction and relationships with parents, siblings, and other care-givers; (2) the child's wishes, as expressed by the child or through the child's guardian ad litem; (3) the child's custodial history, including whether the child has been in custody for twelve or more of a twenty-two month period; (4) the child's need for and the parent's ability to provide a legally secure placement; and (5) whether the parents have been convicted of certain crimes, have failed to provide food or medical attention to their children, or have abandoned their children. R.C. 2151.414(D). The court also shall consider any other relevant factors. Id.
 {¶ 11} In this case, the trial court carefully enumerated each of the R.C. 2151.414(D) factors for determining the best interests of Carol and made specific factual findings with regard to each. The trial court stated many factual findings under the first factor, R.C. 2151.414(D)(1), including "Mother is diagnosed as having schizotypal personality disorder marked by paranoia and psychosis." Under the fourth factor, R.C. 2151.414(D)(4), the court stated the following factual findings, "Carol desperately needs a legally secure permanent placement which cannot be achieved without a grant of permanent custody to [CS]. There are no appropriate relatives who are willing or able to assume custody of Carol. Since her removal, Carol has lived in at least three foster homes and is not a candidate for a planned permanent living arrangement. She is adoptable and an award of permanent custody would allow this seven year old to become a part of a stable life-long family."
 {¶ 12} Later, the trial court stated, "Pursuant to R.C.2151.419(A)(1), the Court finds that [CS] has made reasonable efforts to prevent the removal of the child from the home, to eliminate the continued removal of the child from the home, and to make it possible for the child to return safely to the home." The court went on to state several reasons why these reasonable efforts did not work including "mother cannot handle even basic tasks such as cleaning her apartment to a degree that would allow even a safe visitation."
 A. {¶ 13} Mother first argues that the trial court erred when it made a factual finding under R.C. 2151.414(D)(1) that she was "diagnosed as having schizotypal personality disorder marked by paranoia and psychosis." Mother admits that Dr. Leslie Risin gave this diagnosis but contends that Dr. Judith Rhue contradicted the diagnosis. Mother further claims that Dr. Risin's diagnosis was invalid because of the distracting environment in which it was conducted. Mother maintains that her problems are caused by her hypoglycemia, not a mental illness.
 {¶ 14} At the dispositional hearing, Dr. Leslie Risin testified as an expert in the field of clinical psychology. She testified that she performed a psychological evaluation of Mother to determine her psychological functioning. This evaluation consisted of a three hour interview and some standard tests, i.e. the MMPI-2, Incomplete Sentence Blank, and the Shipley Institute of Living Scale. The interview lasted three hours because Mother had a hard time being concise and getting to the point. Mother showed very illogical thought processes at times and paranoid beliefs during the interview. Mother believed that CS was involved with her because Carol was a good adoptable child, instead of any fault that she had. Mother indicated that the prior owners of her house were the reason why she could not get the walls and floors clean. She said that something was in the walls and floors that caused them to keep getting dirty. She also indicated to Dr. Risin that she could not think clearly when she is with Carol and gets overwhelmed. The MMPI-2 results indicated that Mother tends to decompensate when she is stressed and becomes psychotic.
 {¶ 15} Based on the interview and the test results, Dr. Risin diagnosed Mother with schizotypal personality, which is a long-standing personality disorder characterized by difficulties in thinking and eccentricities of behavior. Dr. Risin opined that Mother was not able to adequately parent Carol at the time of the evaluation.
 {¶ 16} Mother testified that she does not have a mental illness, but instead, suffers from hypoglycemia. However, Dr. Risin testified that hypoglycemia would not explain the Mother's long-standing symptoms. The Mother did not offer any evidence at the hearing to substantiate that she has hypoglycemia.
 {¶ 17} Dr. Judith Rhue, a clinical psychologist and professor of family medicine at the College of Osteopathic Medicine at Ohio University, testified at the hearing on October 15, 2003. She treated Mother over the years but more frequently from January through June 2003, but she did not treat Mother after June 2003. She had diagnosed Mother with a depressive disorder and an anxiety reaction. She did not reject Dr. Risin's diagnosis. She simply said that she did not have an opinion regarding Dr. Risin's evaluation. She further said that Mother was not ready to take care of Carol when she last saw Mother in June 2003.
 {¶ 18} Here, we have reviewed the record and are mindful that the trial court, as the trier of fact, was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We find that the above testimony is competent, credible evidence that supports the trial court's factual finding. Hence, the trial court did not err when it found that the Mother suffers from a schizotypal personality disorder marked by paranoia and psychosis. Consequently, we reject Mother's first argument.
 B. {¶ 19} Mother next argues that the trial court erred when it made a factual finding in support of its "reasonable efforts" finding under R.C. 2151.419(A)(1) that she had not cleaned her home to a degree required for in-home visits by Carol. Mother contends that HUD did a home inspection and that she passed this inspection. She claims that CS worked with her before Carol was removed and that one of these sessions lasted for eight hours with the result that enough items were removed from her home to fill a dumpster and that other items were removed to a storage unit. She maintains that no evidence exists that shows that she has an unclean home after the HUD inspection and the cleaning sessions.
 {¶ 20} At the dispositional hearing, Susan Ballard, a CS caseworker, testified that CS assisted Mother twice to help make her home sanitary. On August 13, 2002, Ballard and CS homemaker Jackie Covert went to Mother's home (an apartment) and could not even see the floor. For eight hours, they helped Mother clear a path from the front door into the living room, a path through the kitchen, a path up the stairwell and a path in the hallway. On October 17, 2002, they helped the Mother fill a second dumpster with debris. In addition, they helped her place many items from her home in storage. Ballard testified that these two cleaning days only made minimal progress toward making the home safe for Carol to return there.
 {¶ 21} Mother testified that she knew that getting and keeping her home clean, sanitary and free of clutter was part of the case plan requirements. On October 17, 2002, Mother refused to allow CS to inspect her home. She told CS on June 17, 2003 that she still was not going to allow an inspection of her home because the home was not ready. She testified, "I had a lot of things to go through which I'm still going through things and pitchin' em."
 {¶ 22} Ballard testified that November 21, 2002 was the last time that she was in Mother's home, and that Mother indicated that she was still working on the home and would let her know when it was suitable for inspection. Ballard said that she could hardly get the front door open because of the debris and that Mother did not have any paths through the debris. She said that she had to step over items to get through the home.
 {¶ 23} Ballard said that Mother offered various explanations as to why she could not clean her home. The Mother told CS that (1) her allergies were bothering her, (2) she injured herself while hiking to look at geese, (3) she did not feel well and (4) she needed some down time to do things for herself.
 {¶ 24} Even though Mother would not allow CS to inspect her home, she did allow HUD to do an inspection in April 2003. However, Ballard testified that HUD's inspection is different than a CS inspection because it focuses on different issues. She said that it focuses on safety issues, i.e. "the safety of being able to enter and exit the home safely, and that things like the heating ducts and the furnace, and you know, that there wasn't debris around these items so that the home was safe." Mother corroborated Ballard when she testified, "[HUD] told me just as long as the boxes was away from the backdoor the front door and I had up there in my room a table in front of my bedroom window HUD made me move it because if they had to in case of fire we could climb out the window. Basically that's all they told me."
 {¶ 25} We find that the above testimony is competent, credible evidence supporting the trial court's factual finding. Hence, the trial court did not err when it found that Mother had not cleaned her home sufficiently to allow for in-home visitation with her daughter. Consequently, we reject Mother's second argument.
 C. {¶ 26} Mother finally argues that the trial court erred when it found that Carol's need for a legally secure permanent placement cannot be achieved without a grant of permanent custody. Mother contends that the trial court should have placed Carol back with her because she has relatives who can help her, including her mother.
 {¶ 27} The record shows that Carol's maternal grandmother used to help Mother care for Carol by keeping her three days a week. However, the grandmother's health is failing. The grandmother is in remission of throat cancer and uses a walker to get around. Mother testified that Carol's grandmother would not be able to supervise Carol now. Mother is afraid that Carol's grandmother will fall so she checks on her almost daily.
 {¶ 28} The record further shows that no relative sought custody of Carol during the pendency of this case. This includes relatives that Mother claims Carol has a good bond with, i.e. "her grandmother, her sister Desiree, her Aunt Mary, and her nephew Jonathan."
 {¶ 29} Based on the above record, we find that competent, credible evidence supports the trial court's finding that Carol's need for a legally secure placement cannot be achieved without a grant of permanent custody. Hence, the trial court did not err when it made this finding. Consequently, we reject Mother's third and final argument.
 {¶ 30} Accordingly, we overrule both of Mother's assignments of error and affirm the judgment of the trial court.
Judgment affirmed.
Abele, J. and Harsha, J.: Concur in Judgment and Opinion.